## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | | |
|---|---|---|---|
| **YUSUF KALYANGO, PH.D.** | ) | **CASE NO:** | **2:22-cv-02028** |
| 1 Banbury Drive | | | |
| Athens, Ohio 45701 | ) | | |
| | | **JUDGE** | |
| **Plaintiff,** | ) | | |
| | | | |
| **v.** | ) | **COMPLAINT** | |
| | | | |
| **OHIO UNIVERSITY** | ) | | |
| c/o Elizabeth Sayrs, Ph.D., | | TRIAL BY JURY DEMANDED | |
| **Executive Vice-President and** | ) | | |
| **Provost** | | | |
| **1 Ohio University** | ) | | |
| **Athens, Ohio  45701** | | | |
| | ) | | |
| **And** | | | |
| | ) | | |
| **OHIO UNIVERSITY BOARD** | ) | | |
| **OF TRUSTEES** | | | |
| **Gary Cooper** | ) | | |
| **Anna Harvey** | | | |
| **Jeff Laturell** | ) | | |
| **Lorri Platt** | | | |
| **Ellen Gill Franks** | ) | | |
| **Scott Borgemenke** | | | |
| **Misty Crosby** | ) | | |
| **Janelle Coleman** | | | |
| **Peggy Viehweger** | ) | | |
| **Eileen Sheil** | | | |
| **Steve Casciani** | ) | | |
| **Diane Smullen** | | | |
| **Matthew Evans** | ) | | |
| **Sarah Ladipo** | | | |
| **1 Ohio University** | ) | | |
| **Athens, Ohio  45701** | | | |
| | ) | | |
| **Defendants.** | ) | | |

### Nature of the Action

Plaintiff, Dr. Yusuf Kalyango, Ph.D. ("Plaintiff" or "Dr. Kalyango"), by and through his attorneys, brings this action against Defendant Ohio University for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-1, *et seq.,* as amended (hereinafter referred to as "Title VII"), and the Civil Rights Act of 1991, 42 U.S.C. 1981a, as amended; the Civil Rights Act of 1871; the Civil Rights Act of 1866, 42 U.S.C. 1981, and the Ohio Civil Rights Act, Ohio Revised Code Chapter 4112.01 *et. seq.,* to vindicate federal and state protected rights against unlawful employment practices on the basis of race, gender, national origin and retaliation.  Plaintiff was issued his right to sue letter by the Ohio Civil Rights Commission on March 10, 2022.

### Parties and Involved Employees and Agents

1.      Plaintiff Yusuf Kalyango was, at all relevant times, a tenured Professor and director of the Institute for International Journalism at Ohio University E.W. Scripps School of Journalism, and is a is a resident of the State of Ohio within the Southern District of Ohio.

2.      Defendant Ohio University is a public university operating in the State of Ohio with its principle place of business located at Athens, Ohio.

3.      Defendant Board of Trustees are individuals who acted as agents for Ohio University and condoned, ratified and engaged in discriminatory conduct in their capacity as managers of the Ohio University protocols and procedures, including procedures to discipline fully tenured professors.

3.      M. Duane Nellis was named President of Ohio University on or about February 22, 2017. Since becoming president of Ohio University,  M. Duane Nellis promised and continues to

tout his commitment to elevate academic quality and engagement, diversity and inclusion, and global engagement, among other things.

4.     Chaden Djalali is currently serving as a tenured Professor of Physics and Astronomy in the College of Arts and Sciences at Ohio University. Prior to this current academic position, Chaden Djalali was hired from the University of Iowa and was appointed on May 7, 2018, as the Executive Vice President and Provost of Ohio University.   Djalali stepped down abruptly from senior executive leadership in May 2019, effective immediately.

5.     Brian Scott Titsworth is the dean of the Scripps College of Communication at Ohio University. He is the administrative head of the unit (Scripps College of Communication) that employs the Plaintiff, Dr. Kalyango, both as a tenured full Professor and as Director of the Institute for International Journalism (IIJ). Titsworth is also a tenured Professor and has served as dean of the Scripps College of Communication since 2010.

6.      Robert K. Stewart is a retired Director of the E.W. Scripps School of Journalism at Ohio University. He served as director from 2010 until his retirement in June 2020. He is now Professor Emeritus of the same school. As director of the school, he was the immediate supervisor of Plaintiff, Dr. Kalyango, both as a faculty member and as director of IIJ.

7.      George Antonio Anaya is a Civil Rights Investigator in the Title IX Office – the Office for Equity and Civil Rights Compliance at Ohio University.  Anaya,  an attorney, joined Ohio University in May 2017 as an investigator; as well as to assure institutional compliance with rapidly changing Title IX mandates of both the Department of Education and federal court decisions. Ohio University was Anaya's first higher education salaried fulltime employment in this specific role as a civil rights investigator.

8. Sara L. Trower was the executive director of Ohio University's Office of Civil Rights Compliance and Title IX Coordinator. Trower was George Anaya's supervisor. She left her position at Ohio University in 2018.

9. Michael S. Sweeney is a tenured professor of journalism history in the E.W. Scripps School of Journalism at Ohio University. He joined Ohio University in 2009 and became associate director of graduate studies in the journalism school; advising and the administering academic program/affairs of the journalism graduate students in the school until he resigned as the school's associate director of graduate studies in the spring of 2018. His immediate supervisor was Robert Stewart (now retired) in the E.W. Scripps School of Journalism at Ohio University.

## Jurisdiction and Venue

10. This suit is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., providing for relief from discrimination in employment on the basis of race, and pursuant to 42 U.S.C. 1981a, providing for relief from discrimination in contractual relationships. The Ohio Revised Code §4112.02 *et seq*., prohibits discrimination in employment on the basis of race, national origin and sex.

11. This Court has general federal question jurisdiction pursuant to 28 U.S.C. §1331.

12. This Court has supplemental jurisdiction of plaintiff's state law claim pursuant to 28 U.S.C.A. §1367.

13. Venue is properly laid in the Southern District of Ohio under 28 U.S.C. §1391(b) because plaintiff is a resident within the Southern District of Ohio, Defendant Ohio University is located within the Southern District of Ohio, and the claims arose within the Southern District of Ohio.

## Administrative Process

14.     Dr. Kalyango filed an administrative charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about March 28, 2019; this charge was docketed at 532-2019-01361.

15.     Dr. Kalyango requested a "Right to Sue" letter on April 29, 2020, and the EEOC issued a "Right to Sue" notice, through the U.S. Department of Justice, to Dr. Kalyango on or about July 23, 2020.

## Factual Background

16.     Dr. Kalyango is a black male, and his national origin is East Africa, of Ugandan descent. Dr. Kalyango is a U.S. Citizen, and African American, with two interracial sons born in Missouri and Ohio.

17.     Dr. Kalyango earned a Ph.D. from University of Missouri - Columbia in 2008 specializing in political communication, journalism studies and comparative public opinion research.  Dr. Kalyango also has a Masters Degree in journalism with an emphasis on media management from the University of Missouri - Columbia, 2004.  Dr. Kalyango is also a Fulbright specialist from 2015 to 2020 and an Alumni Fellow of the World Press Institute at Macalester College, Minnesota, from 2001.

18.     Dr.  Kalyango is an author, scholar, and well-respected professor, educator and professional.  Dr.  Kalyango has traveled internationally as a professional – both as a former foreign correspondent and as an educator in more than 65 countries – for the benefit of students at Ohio University, in his efforts to educate and teach Ohio University students about diversity.

19.     Dr. Kalyango joined the faculty of Ohio University in the fall of 2008, teaching broadcast news, advanced research and international journalism, foreign correspondence, media

and conflicts, specialized journalism and graduate courses. Dr. Kalyango is a graduate research advisor and consultant at various universities in central and southern Asia and Africa. Dr. Kalyango also supervised doctoral (Ph.D.) dissertation work at Ohio University for students at other universities in the Middle East Central Asia, and South Asia.

20.      Some of Dr. Kalyango's Ph.D. students (all female candidates) he directly supervised were hired upon graduation – as assistant professors on tenure track – in public universities that are bigger in research and in endowment than Ohio University, which elevates the profile of the E.W. Scripps School of Journalism.

21.      Kalyango has more than 50 academic publications (books, book chapters, scientific journal articles, and scholarly encyclopedia entries) and is the author and editor of three scholarly books, *African Media and Democratization*; *Why Discourse Matters*; and *Global Journalism Practice and New Media Performance*. Dr. Kalyango is the former editor of a scholarly peer reviewed mass communication journal, *The International Communication Research Journal*, a publication of the International Communication Division of the Association for Education in Journalism and Mass Communication. Since joining Ohio University, Dr. Kalyango has served on the Executive Boards of various academic conventions and associations (or as an active member), such as the International Communication Division of the AEJMC, ASA, the ISA IAMCR, WJS, and others.

22.      Some of Dr. Kalyango's initiatives for the Institute for International Journalism include administering annual journalism study abroad programs, two major U.S. Department of State funded annual renewable grants called *Study of the U.S. Institute (SUSI)* for eighteen journalism and media scholars from around the world, and the Mandela Washington Fellows YALI Connect Camps. Dr. Kalyango assists in establishing annual international media workshops for

journalists and communications specialists, coordinates and organizes international research conferences. Dr. Kalyango also coordinates other international cooperative programs with various media advocacy institutions, as part of his teaching, mentoring and scholarship with defendant Ohio University. This elevated the global profile of the University and the Scripps College of Communication.

23. On or about April 1, 2013, Dr. Kalyango earned an accelerated promotion, with unanimous faculty votes from the Promotion and Tenure Committee ("P&T") of the journalism school from the rank of Assistant Professor to Associate Professor with tenure (in just 5 years) at Ohio University. He earned a final promotion from the rank of Associate Professor to full Professor (in just 3 years) in the Scripps College of Communication. As of August 2018, Dr. Kalyango is still the only tenured black full Professor at Ohio University's School of Journalism.

24. Between 2012 and 2015, Dr. Kalyango gained such a prominent national and global reputation that Ohio University strategically deterred other universities from hiring him away from Ohio University by accelerating his promotion to full Professorship; he received "opportunity hires" from other higher-ranked, bigger and well-endowed universities (in Florida and Texas) during the period. Former Ohio University President, Dr. Roderick J. McDavis called Dr. Kalyango and persuaded him to disregard those better opportunities to stay at Ohio University.

25. Dr. Kalyango became the first ever black minority tenured educator to earn full Professorship in the 115-plus year history of Ohio University's E.W. Scripps School of Journalism. Also, notably in 2018, Dr. Kalyango was named a finalist for the prestigious *Presidential Teacher Award* at Ohio University, the highest teaching honor awarded by the president/institution at Ohio University, which no African American male professor had ever been awarded in its 30-year history.

26.     From 2010 to 2018, Dr. Kalyango consistently received the highest peer review of teaching and academic service, earning the faculty's top rating of coveted "Exceeds Expectations" rating, coupled with his exceptional external grant-seeking successes and grants management, as well as his global engagements and outreach on behalf of the school and University, which were the primary reasons he received an accelerated promotion to Associate Professor with tenure and then to full Professor in record time.

### The Herman Complaint

27.     In or around February 2017, a graduate student at Ohio University, Tess Herman, a Caucasian female, inquired about and began working with the YALI Connect Camp project, as Dr. Kalyango's assistant.

28.     Throughout the course of the spring of 2017, Dr. Kalyango worked with a group of graduate students, including Ms. Herman, for purposes of coordinating the U.S. funded international projects called the YALI Connect Camps (administered in Africa) and the SUSI (in-coming global) programs.  The summer2 YALI Connect Camps program took place in South Africa in June of 2017.  A female professor from Ohio University, Professor Mary Rogus, also traveled to South Africa.  The itinerary required Dr. Kalyango to fly from South Africa to Rwanda on June 19 through 24, 2017 for an Ohio University funded training program.  In addition to the itinerary for the YALI Connect Camps presentations, the local program coordinator in Rwanda, Dr. Ange Imanishimwe, also proposed a one-day pre-training program side-trip in Rwanda to attend a tourist Gorilla Trekking activity, which Ms. Herman gladly accepted and participated in.

29.     While in Rwanda, Ms. Herman stayed at the Lake Kivu Resort in Butare, Rwanda. At the same time, Dr. Kalyango was scheduled to give a presentation at the President's Office in Rwanda and stayed at the Radisson Blu Hotel in Kigali, Rwanda, approximately six (6) hours away

from Butare. While in Rwanda, Ms. Herman presented at an International Environmental Journalism Workshop for professionals moderated by Mr. Ange Imanishimwe, sponsored by Ohio University and the institute headed by Dr. Kalyango. Consistent with faculty norms at the University, Dr. Kalyango commonly helps his program assistants and graduate students by mentoring and expanding their academic and professional horizons in such ways.

30.     While working in South Africa before the Rwanda trip, Ms. Herman was required as part of her role in the YALI Connect Camp project to prepare a comprehensive financial report accounting for all of the receipts and expenditures for the group on the South Africa trip.

31.     Following their return to the United States, Ms. Herman submitted a grossly inadequate and erroneous report to Dr. Kalyango, which failed to properly itemize, inventory or reconcile the receipts and expenditures for the trip.

32.     In his role as Ms. Herman's supervisor, on or about July 5, 2017, Dr. Kalyango advised Ms. Herman that her work was less than satisfactory, and that she should learn from her errors in order to improve her performance on subsequent trips. Dr. Kalyango did not terminate Ms. Herman from YALI, nor did he indicate that Ms. Herman's employment with the internationally-run program that was administered in the IIJ institute at Ohio University was in jeopardy.

33.     Upon her return to Ohio University in June, 2017, Ms. Herman immediately started working on another major summer program called SUSI, which was also administered and headed by Dr. Kalyango and Professor Rogus. Ms. Herman also expressed great satisfaction with her YALI Connect Camp experience to other student-employees in the presence of Professor Rogus in a SUSI staff meeting, expressing gratitude and her intent to participate again in the next Ethiopia-bound YALI trip. For first three weeks upon her return, Ms. Herman did not register a

9

single complaint to anyone in the University regarding any negative aspect of her experience in South Africa or Rwanda until she received the July 5, 2017 correspondence from Dr.  Kalyango.

34.     Shortly after the receipt of the July 5, 2017 correspondence from Dr. Kalyango, Ms. Herman contacted Sara Trower, former Executive Director of University Equity and Civil Rights Compliance and Title IX Coordinator at Ohio University, and gave false and misleading information regarding her employment interaction with Dr. Kalyango.  Namely, Ms. Herman falsely claimed Dr. Kalyango suggested they might need to share a room based on scheduling and availability,  for the first night during the Rwanda trip at Lake Kivu, but that he would do his best to "stay out of her way."  Significantly, Ms. Herman never claimed that Dr.  Kalyango made, suggested or inferred any sexual or romantic advances, and made no claims of physical contact of a sexual nature.  Moreover, Ms. Herman also claimed she refused the suggestion from Dr. Kalyango indicating the situation would create the appearance of impropriety, and other arrangements could be made.

35.     Dr. Kalyango denies such a conversation regarding sharing a room ever occurred and it is undisputed that Dr. Kalayngo and Ms. Herman never shared any accommodation or room in Rwanda, nor was there ever an overture to do so during the trip to Rwanda or South Africa.

### The 2017 Investigation

36.     In response to Ms. Herman's false claim, Ms. Trower provided incorrect information as to Ms. Herman's rights, and the process that could be followed based on the fabrications of Ms. Herman.  Ms. Trower or other employees within the Human Resource Department of Ohio University encouraged Herman to quit her position at YALI Connect Camps in order to create an alleged policy violation against Dr. Kalyango.  That is, Ms. Herman conceded in communications to friends that she learned from Ms. Trower and others in Ms. Trower's

department that Ms. Herman could create a claim against Dr. Kalyango if she claimed she was terminated, or if she resigned,  suggesting such termination or forced resignation was retaliatory based on Ms. Herman's alleged refusal to share a room in Rwanda.

37.     On July 6, 2017, the day after she received the correspondence of criticism from Dr. Kalyango, Ms. Herman presented a Title IX complaint to the Executive Director and Title IX Coordinator for the University Equity and Civil Rights Compliance Panel ("ECRC"). The complaint was presented after Ms. Herman received the prejudicial and improper instructions on how to fabricate a claim from Ms. Trower and her associates.  At that point, Ohio University initiated a severely flawed and  discriminatory investigation by investigator, George Anaya.

38.     To further perpetuate the false claim, on  July 10, 2017, Ms. Herman voluntarily resigned from her position as program assistant for the SUSI program, per the advice of an employee of Ohio University's Human Resources office. Ms. Herman, following the false script created by Ohio University, claimed she was forced to resign.

39.     Mr. Anaya began an investigation in July of 2017 which lasted through August 24 of 2018, when a "Memorandum of Findings" was issued.  Under Ohio University's policies, as well as state and federal law, Ms. Herman's complaint should have been investigated and resolved expeditiously within ninety (90) days.   Mr. Anaya failed to provide Dr. Kalyango with "an anticipated timeline for completion of the investigation" as required by Ohio University's Faculty Handbook.   In fact, no aspect of the investigation was based on any standard set by Ohio University, nor was the investigation prompt or remedial.

40.     Mr. Anaya was directed and supervised by Ms. Trower or others within Ohio University, who contributed to and were aware of the lack of proper protocol and duration of the flawed and result-oriented investigation. This so-called investigation into Dr. Kalyango's alleged

inappropriate behavior violated essentially every standard, common practice, procedure and guideline readily and easily available to human resource and legal professionals.  Significantly, the "investigation" was anything but prompt, thorough or impartial, as required by the EEOC.

41.     Ms. Herman produced no evidence or corroboration to support her allegations, and Mr. Anaya completely disregarded the fact that Dr. Kalyango was scheduled to work in a region approximately six (6) hours away in Rwanda from the hotel in the East African country of Rwanda, where Ms. Herman alleged Dr. Kalyango suggested they might need to share a room.  The flawed investigation was discriminatory based on Dr. Kalyango's race and national origin.

42.     Mr. Anaya also disregarded the statements of several key witnesses presented by Dr. Kalyango, including two Ohio University senior female professors, which validated the statements and evidence presented by Dr. Kalyango.  Anaya also disregarded exculpatory statements from the host-coordinator in Rwanda, Dr.Imanishimwe, another African, who was with Ms. Herman throughout her time in Rwanda. Anya's failure to utilize exculpatory evidence was caused by a discriminatory animus based upon Dr. Kalyango's race and national origin.

43.     Mr. Anaya prepared his report with a discriminatory animus, based upon Dr. Kalyango's race and national origin, depicting Rwanda in particular, and Africa in general (Dr. Kalyango's continent of origin), as a dangerous place and region.  This racial bias lead Mr. Anaya to make conclusions based on statements wholly unsupported by the evidence.

44.     During the entire year within which the investigation commenced, Dr. Kalyango was not placed on administrative leave, but continued with his teaching and other responsibilities at Ohio University.  These undisputed facts verify that the allegations fabricated by Ms. Herman, even if true, were not issues of safety, nor was Ms. Herman so distraught that she needed protection.  In fact, Ms. Herman was under no true threat of harm, was not harmed through any of

the alleged activities forming the basis of the bad faith complaint, establishing that the underlying facts of the alleged complaint were benign.

45. Defendants timed the release of Mr. Anaya's Memorandum of Findings just a few days before fall classes were to begin at Ohio University on August 24, 2018, so as to generate the most dramatic and negative impact on Dr. Kalyango's employment and reputation.

46. In mid-August 2018, Ohio University signed a new policy into effect that created a University Professional Ethics Committee ("UPEC"). Due to the excessive delay in Mr. Anaya's investigation, Dr. Kalyango was subject to the new procedure adopted by Ohio University after the changes officially came into effect in mid-August 2018, which allowed Ohio University to more easily de-tenure and/or dismiss professors.

47. Under either policy adopted by Ohio University, the alleged conduct of Dr. Kalyango was so insubstantial that even if the allegations were deemed true, the remedial action necessary would have been counseling, education or similar corrective measures, which are measures that have been taken by Ohio University when the subject of investigations involving far more serious conduct were American, Caucasian, and/or female. Ohio University chose to treat Dr. Kalyango's issues differently based on his race, national origin and gender, thereby discriminating against him, and treating him differently than other employees who were American born, Caucasian or female.

48. A proper investigation and oversight would have never resulted in an effort to terminate or de-tenure any professor under these facts, absent a discriminatory animus by Ohio University through its employees and agents.

49. In delaying its investigation for over a year, Ohio University did not follow EEOC or the United States Supreme Court's directives to conduct prompt and remedial action with

respect to any investigation of alleged misconduct.  The failure of Mr. Anaya, Ms. Trower and others involved in the investigation to efficiently and confidentially complete the investigation, violated Dr. Kalyango's rights, and such failures by the defendants evidence their clear bias and prejudice against Dr. Kalyango.

50.     Mr. Anaya's investigation consisted almost exclusively of Ms. Herman's subjective statements, solely from her perspective.  There was no corroboration of any of Ms. Herman's claims from independent, objective sources.  More importantly, Dr. Kalyango was never provided an opportunity to directly question Ms. Herman or to have her cross-examined by a representative of Dr. Kalyango despite this request being made in 2018.

51.     The protracted nature of the investigation and the flawed conclusions reached, in conjunction with the improper recommendations made by the biased investigator who was employed and paid by Ohio University, indicate the investigator was not qualified, objective, or unbiased.

**The Administrative De-Tenuring Process**

52.     The dean of the Scripps College of Communications, Scott Titsworth, sent a letter on August 24, 2018 suspending Dr. Kalyango from teaching and reassigned him to do other work in support of the school, college and University's missions including preparations and administration of external grant applications and other administrative activities, as assigned at the discretion of the school director, Robert K. Stewart.

53.     This letter was sent congruent with the strategically-timed and much-delayed release of Mr. Anaya's Memorandum of Findings. Dean Titsworth did nothing to ensure confidentiality for the protection of Dr. Kalyango or anyone involved in the discriminatory investigation.

54. Dean Titsworth's professionally harmful action of suspending Dr. Kalyango was grossly premature in the process as stipulated in the Ohio University Faculty Handbook.

55. Dean Titsworth's socially and emotionally harmful action of suspending Dr. Kalyango was grossly severe as Dr. Kalyango and his family were physically banned from campus where his sons were enrolled in community activities and summer camps, in the college town of Athens, Ohio, with prohibitively limited options for childrens' recreational facilities outside of Ohio University.

56. Dean Titsworth's banishment of Dr. Kalyango from Ohio University in such premeditated severe treatment crippled Dr. Kalyango and his young family, and negatively swayed the appeal process. Dean Titsworth's actions were based on Dr. Kalyango's race and national origin, and he was treated differently than American born, Caucasian professors who had been accused of much worse conduct.

57. Dean Titsworth's suspension of Dr. Kalyango caused mental and emotional anguish for more than two years as the local Athens media headlines negatively focused on the dean's action in suspending Dr. Kalyango, tainted his reputation, which diminished a fair internal review process, among other professionally damaging details.

58. Dr. Kalyango's identity throughout the review process was not protected by Ohio University, in violation of its own policies, and in spite of Dr. Kalyango's complaints, as local media splashed details of the allegations over and over again.

59. As a direct and proximate result of defendant's actions, Dr. Kalyango's reputation has been destroyed, he has been deprived of significant benefits associated with his position at Ohio University, and he has been suspended from his active teaching position.

## Retaliation Against Dr. Kalyango

60.     As the only black faculty member of the journalism graduate committee in the school of journalism at Ohio University from September 2011 to March 2018, Dr. Kalyango complained to School Director Stewart in the spring of 2016 and again in the spring of 2017 that the chair of the graduate admissions committee, Michael S. Sweeney, Professor, E.W. Scripps School of Journalism, was favoring non-minority (American) U.S. students over minority international students in the admission process, and not solely based on the criteria of Ohio University's requirements.  This was prior to the initiation of the investigation and the charges against Dr. Kalyango.

61.     School Director Stewart was duly notified at least two years before the ECRC investigations were ever launched that Professor Sweeney engaged in discriminatory practices in the graduate program.

62.     Since Dr. Kalyango was head of the IIJ and had earned equal status in rank as Professor Sweeney as a full Professor in 2016, he started lobbying School Director Stewart to intervene in the discriminatory admissions practices championed by Professor Sweeney that were not favoring minority black, Hispanic or Muslim applicants from the Middle East, who sought admission into the journalism school's Masters and Doctoral programs.

63.     As the associate director of graduate studies in the school, Professor Sweeney turned down several fully-paying graduate prospective applicants from the Middle East, whom Dr. Kalyango had personally recruited to apply into the graduate program; School Director Stewart was duly notified in 2016 of this as well.

64. School Director Stewart ignored Dr. Kalyango's complaints and appeals about the graduate admission discriminatory practice, but Stewart simply notified Professor Sweeney that Dr. Kalyango was advocating a diverse and inclusive program in terms of specializations and race.

65. Dr. Kalyango noticed Professor Sweeney's indifference and contemporaneously shared his observations with three of his peers in the school in 2016 and 2017.

66. After Mr. Anaya's release of the Memorandum of Findings in August 2018, School Director Stewart denied Dr. Kalyango educational and professional benefits and equitable treatment, stating that Dr. Kalyango did not have any further authority to represent Ohio University at academic conferences and in his global engagements, in light of the allegations of sexual harassment that were still pending procedural reviews. This was inconsistent and exhibited a double-standard similar to the directives from Dean Titsworth's illegal suspension memo.

67. The actions of Dean Titsworth and School Director Stewart in banishing and/or enacting such severe disciplinary suspension sanctions against Dr. Kalyango, even before UPEC reviewed the matter, and before Dr. Kalyango received an opportunity for a critical hearing and cross-examination, were in violation of Ohio University policy and the Faculty Handbook. No policy permitted Dean Titsworth, Director Stewart or Professor Sweeney to prematurely treat Dr. Kalyango differently than his colleagues in the school of journalism before he was given an opportunity for a hearing and cross-examination. Male Caucasian, American-born professors in similar situations in other schools or departments across the University were treated differently and fairly.

68. Ohio University initiated a flawed, discriminatory and retaliatory de-tenuring process through UPEC, following the issuance of the August 2018 investigation report, even

though the recommendations by the investigator along with the underlying claims of Ms. Herman do not warrant nor suggest termination of Dr. Kalyango.

69.     The de-tenuring process initiated by Ohio University has allowed for no cross-examination of witnesses, no ability on the part of Dr. Kalyango to confront those accusing him, and no mechanism for appropriate dissemination of evidence by advocates on Dr. Kalyango's behalf.  This termination process is based on discriminatory and retaliatory motives without any valid or legitimate basis, all of which violate Dr. Kalyango's state and federal rights.  However, once Dr. Kalyango was provided due process before the Faculty Senate Committee as more fully describe below, it was determined that the allegations presented against him without merit and that he should be reinstated.

70.     While Ms. Herman's ECRC complaint was still pending, in February 2018, Dr. Kalyango was implored by a Caucasian, female colleague to speak candidly regarding the insubordination of a student from Dr. Kalyango's M.A. program, Bailey Dick, who had worked for SUSI in the summer of 2017.  Ms. Dick had applied to Ohio University's Doctoral program with the School of Journalism, but was initially denied acceptance.

71.     Ms. Herman filed a retaliation complaint against Dr. Kalyango on behalf of Ms. Dick in February 2018, alleging that Ms. Dick was not admitted in the doctoral program because she was a witness in Ms. Herman's Title IX complaint.  Although Mr. Anaya admitted that Ms. Dick was not a witness in Ms. Herman's complaint, he opened a full investigation on the basis of retaliation against Dr. Kalyango.  This investigation lasted well beyond the 90-day deadline for resolution, and the report finally filed by Ms. Anaya seeped with discriminatory animus and initially attempted to substantiate Ms. Dick's allegations, although he was eventually forced to find the allegations were unsubstantiated after a thorough review of the evidence or lack thereof.

72.     On or about March 20, 2019, Dr. Kalyango filed claims in the United States District Court, Southern District of Ohio, against Ohio University.  On or about April 29, 2019, Dr. Kalyango amended his claims and named individual Ohio University employees as defendants, including Mr. Anaya, Ms. Trower, Chaden Djalali Ph.D., former Executive Vice President and Provost of Ohio University and others, asserting claims including violation of due process and discrimination under Title IX, among others.

73.     In retaliation for the claims asserted against him and Ohio University, and with a discriminatory intent, Mr. Anaya launched a second UPEC investigation with the assistance of Professor Sweeney, a Caucasian, American-born male, and advocate for Ms. Dick, a Caucasian, American-born female.  Professor Sweeney was infuriated that Dr. Kalyango and others voted against the admission of Ms. Dick to the doctorate program.  Additionally, Dr. Kalyango had previously questioned Professor Sweeney, formerly chair of the graduate program, as to why the School of Journalism did not admit more minority/black students in the doctoral program while the school was admitting applicants with GRE scores below the University's threshold.  Professor Sweeney ignored Dr. Kalyango's inquiry, and Dr. Kalyango relayed this discriminatory animus to Mr. Anaya during the ECRC investigation. Mr. Anaya took no action based on the information. In addition, Professor Sweeney directed a smear campaign against Dr. Kalyango following the journalism graduate admissions committee's initial denial of Ms. Dick's admittance to the doctorate program.  All of this information was available to Mr. Anaya and Ohio University, who ignored and supported the retaliatory animus and racially bias conduct of Professor Sweeney and Mr. Anaya.

74.     While performing his investigation in the Herman case, Mr. Anaya gave permission to Professor Sweeney to talk about the Herman case before a convened journalism graduate

admissions committee – in the midst of his investigation of Ms. Herman's allegations – which tainted Dr. Kalyango's standing among his peers even before Mr. Anaya concluded his biased investigations. With Mr. Anaya's prior knowledge and permission, Professor Sweeney proceeded to publicly expose an investigation and gave his opinion before the journalism graduate committee that he believed Ms. Herman's allegations, and that Dr. Kalyango had engaged in sexual misconduct. Dr. Kalyango's peers were shocked at hearing such accusations in a public meeting.

75. Mr. Anaya and Professor Sweeney then revived a complaint against Dr. Kalyango that had been fully investigated and dismissed in 2012. The basis of the complaint involved a group of Ohio University graduate students on a study-abroad program, including Lindsay Boyle who was Dr. Kalyango's program assistant in the IIJ, Dr. Kalyango and other lecturers in Lusaka, Zambia in 2011. After the group returned to the United States, an allegation was made of potentially inappropriate conduct by another student in the program on the part of Dr. Kalyango with regard to Ms. Boyle. Yet, the complaint was initially made against one of Dr. Kalyango's lecturers from the University of Zambia in Lusaka, in late 2011 - not against Dr. Kalyango. An investigation was conducted pursuant to rules applicable at the time, including an interview with Ms. Boyle, email exchanges between Ms. Boyle and the Title IX Office, and other personnel on the Zambia trip. The investigation concluded and a Memorandum of Finding was issued in early 2012, which cleared Dr. Kalyango of any wrongdoing, as the allegations against Dr. Kalyango were determined to be unfounded. Ms. Boyle continued to work with Dr. Kalyango for 18 months until summer 2013 as his Program Assistant in the school's IIJ institute. She went on to be successful in her remaining undergraduate educational experience at Ohio University and ultimately graduated and moved into her career. She even continued to be in contact with Dr.

Kalyango, who occasionally helped her in late 2013 and early 2014 – as he did with all his graduates and advisees – with her job searches and initial career navigation.

76.     After Dr. Kalyango had asserted his claims against Ohio University and others, Mr. Anaya retaliated against him by re-opening the Boyle/Zambia investigation from 2012.

77.     Although Ohio University Policy regarding harassment in effect between March 27, 2006 and August 3, 2012 was the applicable provision of the handbook governing the conduct of Dr. Kalyango during the Zambia trip, and said provision contained a 180 day time limit, Mr. Anaya ignored the provision, and the time limit, as well as the undeniable fact that the investigation had previously concluded with no finding of inappropriate conduct.

78.     In an attempt to shore up the embarrassingly inept investigation he was still conducting in the Herman matter, and in a continuation of their discriminatory animus against Dr. Kalyango, Mr. Anaya and Professor Sweeney tracked down Ms. Boyle out of state, in Connecticut where she lived and worked, and persuaded her to recant or recast her recollections of six years earlier.

79.     Through coordination with other faculty members, Mr. Anaya constructed a narrative based upon Ms. Boyle's newly formulated recollections from six years before and then imposed 2019 standards upon the determination and concluded that Dr. Kalyango had violated the sexual harassment policy of Ohio University during the 2011 Zambia trip. Mr. Anaya then used this conclusion as support for his conclusion in the Herman matter.

80.     In a step that can only be viewed reasonably as a blatant retaliatory strike, Mr. Anaya then issued a Memorandum of Finding on May 30, 2019, almost exactly one month after he was personally named as a defendant in Dr. Kalyango's claims against Ohio University.

81. In terms of sheer temporal proximity, Mr. Anaya's May 30, 2019, Memorandum of Finding is a direct retaliatory response to Dr. Kalyango's assertion of his claims against Mr. Anaya and Ohio University.

82. As with the previous investigation, Mr. Anaya concluded, based on innuendo, hearsay, and a discriminatory animus, that Dr. Kalyango's conduct relative to the 2011 matter was "severe enough to create an intimidating, hostile and offensive educational and work environment" notwithstanding the fact that Ms. Boyle had long since successfully completed her education at Ohio University, graduated and was working in her desired field of study. Meanwhile, between 2012 and 2017, Dr. Kalyango received the highest "Exceeds Expectations" score from his colleagues, numerous accolades from domestic and foreign academic institutions, published two additional books and approximately 30 peer-reviewed empirical research, and brought over $3 million in grants to the Scripps College of Communication and Ohio University. In the same time period, he traveled without incident with more than fifty female colleagues and female graduate and undergraduate students on grant-funded, international study abroad, and/or conference programs.

83. All of the discriminatory and retaliatory conduct of Professor Sweeney and Mr. Anaya was known, condoned, and authorized by Ohio University.

**Discriminatory Administrative Process Following Investigation**

84. Without notifying Dr. Kalyango, then Provost Djalali initiated the UPEC review committee for the Boyle matter, constructed entirely of white/Caucasian faculty members with no diversity and no experience or responsibility for any study abroad student supervision. UPEC received this charge on October 7, 2019, and ultimately issued a report on November 11, 2019, rubber-stamping Mr. Anaya's conclusions in the May 30, 2019 Memorandum of Finding, without

one reference to the 23 page statement filed in response to the Memorandum of Finding by Dr. Kalyango.  Likewise, the UPEC committee never interviewed Dr. Kalyango or otherwise took evidence from his perspective regarding the six-year-old previously closed investigation.

85.     Dr. Kalyango specifically requested in writing that the UPEC ad hoc committee consist of some members with diversity and teaching abroad background. This request was denied as the former Provost did not even bother to respond.

86.     In addition to the unlawful nature of the investigation substantively, the procedure was against Ohio University's policy.  Based upon the issuance date of the Memorandum of Finding, the UPEC should have been formed no later than August 7, 2019, according to the faculty handbook applicable in 2019.  As it happened, Provost Djalali did not form the UPEC until October 7, 2019, two months after the mandatory faculty handbook deadline.  This inaction from Provost Djalali and other decision-makers created more undue mental and emotional distress upon Dr. Kalyango, in addition to the psychological trauma triggered over a two-year period because of the protracted procedural flaws by Mr. Anaya, exacerbated by School Director Stewart.

87.     The faculty handbook allowed for 45 days for the UPEC to conduct its review, write its report and submit its recommendations to the Provost, which would have set the date for the UPEC report at September 21, 2019.  These guidelines are designed to minimize harm to the accuser and the accused, yet as in the Herman matter, Ohio University and the administrative defendants blatantly ignored the mandatory time-line for the investigation and review by UPEC. Although the Ohio University faculty handbook specifically mandates that a UPEC will not observe the academic calendar (student breaks, vacations, etc., cannot be an excuse for delay), the UPEC nevertheless conducted itself in a manner completely untethered from any of the guidelines or mandatory deadlines set forth in the faculty handbook.

88. The faculty handbook mandates that the final report from UPEC "should include sufficient detail of the review process to permit an assessment of the reasons for determining recommendations", yet there is not one mention of Dr. Kalyango's 23 page statement to the investigator, or any indication that the UPEC did anything other than consider Mr. Anaya's biased and discriminatory Memorandum of Findings without any independent consideration of any evidence or any interview of Dr. Kalyango.

89. In this particular case, the UPEC report was not issued until November 11, 2019, months after the deadlines imposed by the University's own handbook in effect in 2019. Although Dr. Kalyango expressed outrage that Ohio University was applying 2019 faculty handbook standards, adopted well after the alleged incident which occurred in 2011, relative to the investigation of the May 30, 2019, Memorandum of Findings, the process was further convoluted by the fact that Ohio University then decided to abandon the structure of the faculty handbook applicable in 2019 and proceed in a manner totally inconsistent with any rules or regulations applicable at the time.

90. In a November 11, 2019 report by the UPEC, there is a recommendation that the de-tenuring process proceed, which is the most severe sanction available. Dr. Kalyango has appealed the decision.

91. The recommendation of the UPEC, ratified and adopted by Ohio University, represents blatantly disparate treatment of Dr. Kalyango, the only black tenured full professor in the E.W. Scripps College of Journalism.

92. Even within his department, School Director Stewart coordinated the suspension with Dean Titsworth as they denied Dr. Kalyango employment benefits, access to programs, access

to pertinent information within the school, and equitable treatment from August 2018 until Dean Stewart retired on June 30, 2020.

93.     School Director Stewart intentionally and willfully blocked or removed Dr. Kalyango from the school's mailing and email lists. Dr. Kalyango never received any school announcements related to personnel affairs, faculty meeting minutes, academic issues, professional development updates, or any other school-related developments. Stewart, as director, made this arbitrary adverse action to deny Dr. Kalyango these professionally basic essential benefits by all other faculty members and available to everyone else in the school. Meanwhile, Caucasian, American-born professors in similar situations in other schools or departments across the University were treated differently and fairly, such as Psychology, English, Chemistry, and others.

94.     During the course of the Faculty Handbook-required school review (Section II.D.5a) of the de-tenuring recommendation, School Director Stewart misled Dr. Kalyango, concealed pertinent information that was in Dr. Kalyango's favor from the faculty that director Stewart had read and had asked for on behalf of the faculty; then held secretive closed-door individual meetings with only 11 out of 27 faculty members. Two of the 11 members who spoke to him privately were probationary faculty and not part of the tenured faculty review (P&T) committee.

95.     According to School Director Stewart's hand notes of these closed-door, private, individual meetings, half of the journalism faculty members that he secretly talked to indicated that they did not support de-tenuring Dr. Kalyango on the basis of such sexual harassment allegations – excluding the probationary members. The notes also showed that some colleagues

expressed disapproval of how Dr. Kalyango was treated unfairly by Ohio University's process, and by Professor Sweeney.

96. School Director Stewart limited participation by planning the Faculty Handbook-required school review to occur the week of a University closure, on Mach 16 and 17, 2020, which was an extended Ohio University Spring Break due to the Statewide emergency of the Coronavirus pandemic.

97. In his written letter recommending that Dr. Kalyango be de-tenured, School Director Stewart then misrepresented the closed-door private individual meetings and the sentiments of the handful faculty with whom he met.

98. School Director Stewart discriminated and retaliated against Dr. Kalyango, negating customary procedural de-tenuring norms with the failure to allow the P&T committee deliberation and a P&T vote, which is contrary to other Ohio University departments and P&T committees that have reviewed similar situations of sexual misconduct in loss-of-tenure cases.

99. In March 2020, during Ohio University's extended Spring Break, School Director Stewart never provided the journalism faculty members (Dr. Kalyango's peers) the opportunity to review the file folder with Dr. Kalyango's UPEC statements, Dr. Kalyango's written statement to the school director, and grievance statements made to the Provost and appeal statements to the President, which Stewart had requested from Dr. Kalyango and had promised to share with his peers.

100. Instead, School director Stewart intentionally and willfully went back to the same investigator, Mr. Anaya of the Title IX Office, who then only provided Dr. Kalyango's peers a partial folder of the investigation materials initially compiled by Mr. Anaya.

101.    In violation of the Faculty Handbook regarding the School Director's responsibilities on this matter, Director Stewart negated the forthcoming "Personal Conference Meeting' with Dr. Kalyango, after he organized a secret individually-scheduled closed-door meeting to solicit private passive views on the loss of tenure recommendations. The school faculty members' understanding of the matter was one-sided and subjectively prejudicial because of Stewart's discriminatory and retaliatory actions.

102.    When Dr. Kalyango reported to Dean Titsworth in a pre-meeting memo about Director Stewart's enforced procedural flaws and prejudice, and thereafter filed a formal complaint to Ohio University's ECRC against Director Stewart, then Dean Titsworth intentionally and willfully changed and abandoned his scheduling offer to meet with Dr. Kalyango as stipulated in the Faculty Handbook Section II.D.5.a, which states that "The dean normally will then consult jointly with the faculty member and chair:…"

103.    Consequently, Dean Titsworth's actions and rationales were pretextual, issuing a severely damning retaliatory letter to Provost Sayrs recommending loss of tenure, after he was notified of School Director Stewart's procedural flaws and prejudicial actions, which in fact resulted in an investigation of Director Stewart for discrimination and retaliation on the basis of race and national origin, in violation of University Policy 40.001, launched by Ohio University's Title IX Office.

104.    As a decision-maker, Dean Titsworth not only decided to recommend de-tenuring as a retaliatory action, but he also invoked a financially harmful provision – Faculty Handbook section II.D.5.g – that Dr. Kalyango be stripped of any monetary compensations otherwise entitled to.   This was an intentional abuse of power beyond the Dean's jurisdiction, which caused an irreparable harm to Dr. Kalyango.

105.    The disparate treatment by the University administrators is evident in the fact that a white U.S. national origin non-tenured professor, accused of much more egregious and grave conduct to which he admitted, was recommended only for a written reprimand and additional EEO training, as opposed to dismissal, following a review by the UPEC of a Memorandum of Findings relating to his alleged conduct.  In fact, there are specific instances of *at least* three American-born, Caucasian Professors or educators at Ohio University that were accused of, found liable for, and/or charged criminally for conduct far egregious than that accused of Dr. Kalyango, for which Ohio University only sanctioned with training and/or a limited suspension.  Further, there are *at least* two minority former Ohio University professors that have been de-tenured, terminated, or otherwise forced out of their employment with Ohio University for conduct similar to or less egregious to the conduct of their American-born, Caucasian peers that are still employed with Ohio University.  The policy of Ohio University has been to accept uncorroborated statements of females to the detriment of non-Caucasian, non-native male, either students or professors, regardless of the truth or falsity of those statements.

106.    Ohio University President, M. Duane Nellis, was dully notified in writing on December 26, 2018, and again on January 6, 2019, of the challenges of investigating and reviewing these allegations of sexual harassment against Dr. Kalyango, which purportedly happened abroad in Africa, because of the lack of extraterritorial application and the practical difficulties posed by such investigations. Mr. Anaya's findings of fact, that were incomplete, grossly biased, and racially discriminatory suppositions, which he rendered in his Memorandum of Findings, provided substantive evidence to the President and other senior administrators of such challenges.

107.    President Nellis was also duly informed on January 6, 2019 –  before he accepted former Provost Djalali's de-tenuring recommendation – that given the strong claim of racial bias

and cross-cultural misunderstanding Dr. Kalyango had raised, Provost Djalali intentionally and willfully organized an all-white/Caucasian UPEC, which did not include any members who had experience in Africa programming, did not include any international members, and did not include any members who had administered any study abroad project.

108.    On December 26, 2018, President Nellis was notified that the de-tenuring process would be invalid, depriving Dr. Kalyango of his due process rights, unless Dr. Kalyango was given the opportunity to cross-examine his accuser and her key witnesses, and a record of testimony was made.   The suspension and the precursor de-tenuring proceedings fronted by the University undermined due process rights to a fair cross-examination full hearing.

109.    At all times, as President Nellis knew from Dr. Kalyango's written appeals, the issuance of a written determination regarding responsibility (de-tenuring) should be undertaken following the hearings (cross-examination), which, in Dr. Kalyango's case, he requested in all his statements to Mr. Anaya, to Provost Djalali, and to the non-diverse (all-white) UPEC during the Herman and Boyle proceedings.

110.    In September 2018, Mr. Anaya's other Memorandum of Findings about a white male Ohio University professor charged with much more severe conduct was circulated in the local Athens media at the same time as Dr. Kalyango's Memorandum of Findings were leaked to the media. The ECRC and the university *carefully protected the identity of this accused white male professor* and therefore because of this protection from reputational damage, his identity and photos were effectively concealed from exposure even when the accused white professor's story appeared in the local *Athens News* media on September 12, 2018.

111.    Because Dr. Kalyango received no similar identity protections as his white-male counterpart from Mr. Anaya, the sexual harassment story about him in several local Athens media

mercilessly exposed Dr. Kalyango, repeatedly circulating a large photo of him and other unfounded details onto the internet, and the headlines focused on Dean Titsworth's suspension of Dr. Kalyango and erroneous claims of financial mismanagement, which the University corrected in the media despite Dr. Kalyango's complaints, among other professionally damaging details.

112.    These damaging and discriminatory false statements were circulated before the UPEC was formed to review and make recommendations on the substance of Ms. Herman's allegations against Dr. Kalyango.

113.    Although both School Director Stewart and Mr. Anaya had prior knowledge of Professor Sweeney's (U.S.-born, Caucasian male) retaliation against Dr. Kalyango and his discriminatory actions against minority prospective students, they did not take any remedial actions to protect Dr. Kalyango against Professor Sweeney's smear campaigns.

114.    On October 8, 2018, Dr. Kalyango filed a formal complaint to the ECRC, charged with investigating such matters, and requested ECRC's investigation of Professional Sweeney in the matter of violating Ohio University Policies by engaging in public comments/negative smear campaign as reported in the *Athens News* on October 5, 2018, and other media.

115.    School Director Stewart and Provost Djalali were also contemporaneously notified of this blatant, discriminatory, and retaliatory smear campaign.

116.    The ECRC, under then interim director Kerri Griffin, School Director Stewart, and Provost Djalali, refused to intervene and stop the damage, never acknowledged nor recognized Dr. Kalyango's appeal, and therefore protected Professor Sweeney, allowing him to continue his harmful retaliation.

117.    Such public comments from Professor Sweeney, who was described in the media as a graduate studies administrator, prejudiced due process rights and compromised the integrity

of the investigation in a matter that was under investigation by Mr. Anaya. This particularly tarnished Dr. Kalyango's reputation before his peers and impacted the review process that was currently being conducted by the non-diverse, non-inclusive UPEC.

118.    Ohio University routinely provides legal representation for its employees who are sued in their capacities as employees.

119.    When Ms. Herman brought suit in federal court against Ohio University based upon Mr. Anaya's flawed, biased, and discriminatory Memorandum of Findings, the university provided legal representation to the white, male defendants named in her lawsuit.

120.    Ohio University, with discriminatory and retaliatory intent, based upon his race, national origin, and gender, refused to provided legal representation to Dr. Kalyango in the same lawsuit.

121.    While Dr. Kalyango was awaiting his opportunity to be heard and to be presumably treated fairly, Ohio University continued its discriminatory and retaliatory efforts to unlawfully and unfairly terminate Dr. Kalyango  in the following manner:

a.    Ohio University's Title IX Office launched an inquiry on April 15, 2020, into a complaint against retired OU administrator, school director Robert K. Stewart of violating Title IX's University Policy for retaliating and discriminating Dr. Kalyango on the basis of race and national origin, University Provost, Elizabeth Sayrs, willingly and intentionally undermined the university's internal investigation, which is under her office's jurisdiction and proceeded with the de-tenuring sanction on June 8, 2020 against Dr. Kalyango.

b.    Ohio  University's Title IX Office launched an inquiry on May 7, 2020, into a complaint against OU administrator, Dean of the college, Brian Scott Titsworth of violating Title IX's University Policy for retaliating and discriminating Dr. Kalyango on the basis of race and national origin, University Provost, Elizabeth Sayrs, willingly and intentionally undermined the university's internal investigation, which is under her office's jurisdiction and proceeded with the detenuring sanction on June 8, 2020 against Dr. Kalyango.

c.    University Provost, Elizabeth Sayrs violated University policy, Faculty Handbook Section II.D.5.a, which states that the Provost must undertake "to investigate and arbitrate the difficulty" in a de-tenuring matter, as the ongoing University's Title IX investigations of OU administrators retired school director Robert K. Stewart and the dean of the college, Brian Scott

Titsworth, falls squarely within this scope of her duty and jurisdiction; yet those ongoing investigations have been putatively renounced by her June 8, 2020 de-tenuring sanction.

   d. Ohio University's Title IX Office launched a full investigation on June 22, 2020, against retired OU administrator, school director Robert K. Stewart of violating Title IX's University Policy for retaliating and discriminating Dr. Kalyango on the basis of race and national origin, University President, M. Duane Nellis, willingly and intentionally undermined the university's internal investigation and proceeded with the de-tenuring and dismissal sanction on September 3, 2020 against Dr. Kalyango.

   e. Ohio University's Title IX Office launched a full investigation on June 22, 2020, against OU administrator, Dean of the college, Brian Scott Titsworth of violating Title IX's University Policy for retaliating and discriminating Dr. Kalyango on the basis of race and national origin, University President, M. Duane Nellis, willingly and intentionally undermined the university's internal investigation and proceeded with the de-tenuring and dismissal sanction on September 3, 2020 against Dr. Kalyango.

**Faculty Senate Hearing Committee Votes to Reinstate**

122.   Even though the preceding information and allegations demonstrate discrimination and retaliation contrary to law, the actions of Ohio University through its Board of Trustees in March—April 2021 fully demonstrate the discriminatory animus of the Defendants.

123.   Pursuant to the Faculty Handbook regarding the de-tenuring process, a tenured professor is entitled to a full hearing before a Faculty Senate Committee consisting of other professors within the College. This hearing is evidence based, including submission of exhibits along with testimony of witnesses and arguments of counsel. The Faculty Senate Committee functions as the jury for the University and serves as the final due process procedure to protect not only the charged tenured professor, but the University and students.

124.   A Faculty Senate Committee hearing occurred on December 9, 2020, and December 10, 2020. Ohio University, represented by legal counsel, presented three witnesses, including the two complainant students and the investigator. Dr. Kalyango testified and presented 14 witnesses from all over the world, including former students, professors, and other professionals knowledgeable about Dr. Kalyango, his programs and the underlying allegations.

125.    The Faculty Senate Committee heard two days of live testimony, studied thousands of exhibits and found overwhelmingly (5-1) that the charges were not proven and Dr. Kalyango should be reinstated immediately.  Copies of the two Faculty Senate Hearing Committee Findings, dated December 29, 2020, and April 2, 2021, are attached as Exhibit A and B.

126.    The Board of Trustees reacted to public pressure and inaccurate media coverage of the entire event that had been ongoing since 2017 and objected to the findings of the Faculty Senate Committee, requesting that the Committee reconsider certain issues, mainly as to the quantum of proof necessary for Ohio University to de-tenure Dr. Kalyango. The Faculty Senate Committee used the "clear and convincing" quantum of proof as mandated by the Faculty Handbook, and as stipulated to by legal counsel for Ohio University. In an unprecedented, discriminatory, and retaliatory decision, the Board of Trustees lowered the standard of proof to  "preponderance of the evidence" so that it could disregard the Faculty Senate Committee deliberative process and findings both after the hearing and in response to the Board of Trustee's initial objections.  No Board of Trustees had ever sought to change the manner of proof in such a fashion.

127.    The Board of Trustees also relied upon alleged occurrences that occurred outside of University property, outside the control of the University, and outside of the United States, all contrary to the requirements of Title IX, which specifically limits the application of law to events within the United States. Again, the Board of Trustee's decision process to disregard the applicable law and it own contractual mandates regarding the serious process of de-tenuring a professor establishes the retaliatory and discriminatory animus that proliferated the Board of Trustee's sham decision process.

128.    The Board of Trustees also imposed a further sanction by denying Dr. Kalyango a severance salary that is contractually mandatory for any professor who loses tenure.   The

combination of the Board's actions can only be based on a discriminatory and retaliatory animus, since the facts, law and proof were overwhelmingly if favor of Dr. Kalyango, as found by the Faculty Senate Committee.

129.    Ohio University and its Board of Trustees revoked Dr. Kalyango's  tenure and terminated his employment on April 9, 2021, while at the same time/period the  Board of Trustees was fully aware and duly notified that <u>the University's Title IX Office was still investigating two of its administrators (University investigations)</u>, the Dean of the Scripps College of Communication, Brian Scott Titsworth, and the former director of the journalism school, Robert K. Stewart, for the discriminatory and retaliatory complaints/actions directly related to the School's flawed proceedings, in which those administrators recommended that Dr. Kalyango be de-tenured without providing due process for tenured professors.

123.    Ohio University's former President, Duane Nellis, announced on June 10, 2021, that all university employees who lost income because of the nine months of mandatory furloughs will be refunded all the money they lost. University administrators imposed the mandatory furloughs on all of professors, including Dr. Kalyango, at the start of the fiscal year 2020/2021, to help address chronic budget deficits that were expected.  Dr. Kalyango lost income based on the mandatory furloughs. All employees were refunded their lost wages at the end of June 2021. Dr. Kalyango, who had yet to be provided due process, was denied the lost funds, further establishing the bias and discriminatory animus within Ohio University.

124.    In a severely harmful, lopsided public statement, Ohio University permanently published on its website a smear campaign concerning the publicly-broadcast termination, revealing its bias against non-Caucasian, non-native male professors, regardless of the truth or

falsity of those statements. That public announcement has been on the University's website since April 9, 2021, and continues to harm Dr. Kalyanogo's profession and family.

125. Based on the discriminatory and retaliatory actions of Ohio University, through its agents and its Board of Trustees, Dr. Kalyango has lost his job, his vocation, his reputation and his ability to function in public education.

### Count One
### (Discrimination and Denial of Equal Protection
### Based on Race, National Origin and Gender)
### Title VII of the Civil Rights Act of 1964

123. Plaintiff incorporates by reference Paragraphs 1 through 122 , as if fully rewritten herein.

124. Dr. Kalyango is black, African, African American of East Africa descent, male and a member of a protected class.

125. Dr. Kalyango was similarly situated in all relevant respects to American-born and Caucasian employees treated more favorably, and thus Dr. Kalyango was denied equal protection under the Fourteenth Amendment to the United States Constitution.

126. Ohio University is the unusual employer who discriminates against men.

127. Dr. Kalyango was similarly situated in all relevant respects to female employees treated more favorably.

128. Dr. Kalyango has a distinguished career at Ohio University in all its professional measures in teaching, research, service and creative activities, and was fully qualified for his position at all relevant times.

129. As part of defendant's discrimination based on race, national origin and sex, Ohio University caused Dr. Kalyango to be unjustifiably placed on administrative leave.

130.    Dr. Kalyango's race, national origin and gender were factors that made a difference in defendant's decision to subject Dr. Kalyango to the wrongful charges of discipline and violation of policy procedures claims and administrative leave.

131.    Ohio University, by and through its agents, representatives, and employees, was predisposed to discriminate on the basis of race, national origin, and gender and acted in accordance with that predisposition as stated in the background facts.  This predisposition is evident from other investigations of professors in protected status who were subjected to similar bias and unfair treatment because of their race or national origin; like Dr. Kalyango, these professors were also retaliated against and were subjected to public access to confidential information, all of which was released directly by Ohio University or through Ohio University's acquiesce, when at all times Ohio University knew such disclosure would be damaging to Dr. Kalyango.  Said discriminatory disclosures occurred almost a year before the investigation was completed and at a time when the University and its investigator were required to remain neutral and objective.  This predisposition is also evident from Ohio University's treatment of Caucasian male professors and employees that have received more favorable treatment for alleged conduct that was much more severe.

132.    Defendant discriminated against Dr. Kalyango on the basis of race, national origin and sex with respect to the terms, conditions, and privileges of Dr. Kalyango's employment, including, but not limited to, subjecting him to unfounded investigations, failing to follow its own policies, breaching confidentiality, and proceeding with a de-tenuring process, all in violation of 42 U.S.C. 2000e, *et seq*.

133.    Defendant's stated reasons for the adverse employment actions taken against Dr. Kalyango are pretextual.

134.     Defendant's actions were intentional, willful, wanton, malicious, in conscious disregard and with reckless indifference to for Dr. Kalyango' rights and sensibilities.

135.     If Dr. Kalyango had been Caucasian, American-born and/or female, he would not have been treated in the manner described.

136.     As a direct result of defendant's unlawful discriminatory conduct as set forth above, Dr. Kalyango has been, is being, and will continue to be deprived of income and other benefits and opportunities due to him as a tenured professor, but denied because of his race, national origin and gender, in an amount to be proven at trial.

137.     As a direct result of defendant's unlawful discriminatory conduct as set forth above, Dr. Kalyango is entitled to compensation for all economic loss, past and future lost wages, past and future benefits, non-economic compensatory damages, and reasonable attorneys' fees and costs.

138.     As a further result of defendant's actions, Dr. Kalyango has suffered consequential damages including but not limited to mental anguish, physical and emotional distress, humiliation and embarrassment, loss of earning capacity, and loss of professional reputation.

## **Count Two**

### **(Denial of Equal Contract Rights, 42 USC 1981)**

139.     Plaintiff incorporates by reference Paragraphs 1 through 138, as if fully rewritten herein.

140.     Defendant Ohio University has denied and continues to deny Dr. Kalyango his contractual, procedural and statutory rights to maintain an employment relationship with the defendant free from discrimination on the basis of his race and to be free from retaliation for engaging in protected activity.

141.    Defendant Ohio University has purposefully deprived Dr. Kalyango of equal contract and procedural rights, along with job opportunities and job protections required by Dr. Kalyango's status as a tenured full professor on the basis of his race, and in retaliation for engaging in protected activity.

142.    The acts of Ohio University through its multiple agents have been and continue to be intentional, retaliatory and in wanton and reckless disregard of the rights of Dr. Kalyango.

143.    The Board of Trustees and Ohio University breached their contractual obligations by failing to follow their own mandates regarding time to respond, and the length of the flawed investigation. The Board of Trustees choose to ignore the detailed findings of the Faculty Senate Committee and breached its own contractual obligations by altering the quantum of proof necessary to de-tenure a professor, despite stipulating to the quantum of proof necessary at the beginning of and throughout the two-day hearing.

144.    As a direct and proximate result of the acts and conduct of Ohio University through its agents, including all levels of management, and the Board of Trustees, Dr. Kalyango has suffered and will continue to suffer extreme emotional distress, humiliation, anxiety, depression and loss of esteem and reputation as well as the loss of income, benefits, and productive ability in comparison to that which he could have performed except for the retaliation and discrimination by Ohio University on account or race and engaging in protected activity.

**Count Three**
**(Unlawful Retaliation)**
**Title VII of the Civil Rights Act of 1964**

144.    Plaintiff incorporates by reference Paragraphs 1 through 143, as if fully rewritten herein.

145.     Defendant retaliated against Dr. Kalyango with respect to the terms, conditions, and privileges of his employment including but not limited to, treating him differently than similarly situated, American-born, Caucasion employees with regard to his terms and conditions of employment because of his race, subjecting him to unfounded investigations, failing to follow its own policies, breaching confidentiality, and proceeding with a de-tenuring process, all in violation of 42 U.S.C. 2000e, *et seq*.

146.     As a result of defendant's conduct as set forth above, Dr. Kalyango is entitled to compensation for all economic loss, past and future lost wages, past and future benefits, non-economic compensatory damages, and reasonable attorneys' fees and costs.

**Count Four**
**(Unlawful Discrimination)**
**Ohio Revised Code §§ 4112.02 and 4112.99**

147.     Plaintiff incorporates by reference Paragraphs 1 through 146, as if fully rewritten herein.

148.     Defendant's discriminatory treatment of Dr. Kalyango because of his race, national origin and gender violates Ohio Revised Code §§ 4112.02  and 4112.99.

149.     As a result of defendant's conduct as set forth above, Dr. Kalyango is entitled to compensation for all economic loss, past and future lost wages, past and future benefits, non-economic compensatory damages, physical and emotional distress, and reasonable attorneys' fees and costs.

**Count Five+**
**(Unlawful Retaliation)**
**Ohio Revised Code §§ 4112.02 and 4112.99**

150.     Plaintiff incorporates by reference Paragraphs 1 through 149, as if fully rewritten herein.

151.    Defendant retaliated against Dr. Kalyango with respect to the terms, conditions, and privileges of his employment including but not limited to, subjecting him to unfounded investigations, failing to follow its own policies, breaching confidentiality, and proceeding with a de-tenuring process, all in violation of Ohio Revised Code §4112.02 , *et seq*.

152.    As a result of defendant's conduct as set forth above, Dr. Kalyango is entitled to compensation for all economic loss, past and future lost wages, past and future benefits, non-economic compensatory damages, physical and emotional distress damages, and reasonable attorneys' fees and costs.

## County Six
### (Breach of Employment Contract/Detrimental Reliance/Misrepresentation)

135.    Dr. Kalyango incorporates herein as if fully rewritten paragraphs 1-134.

136.    As a tenured professor Dr. Kalyango had contractual protections established by the Faculty Handbook and the implied protections followed by Ohio University historically and for other professors, especially those professors who were not employees of color.

137.    Pursuant to these contractual protections, Dr. Kalyango was entitled to rely upon Ohio University policy and procedures set forth in the Faculty Handbook as well as Ohio University's obligation of good faith and fair dealing regarding his employment.

138.    In reliance on these clear responsibilities, Dr. Kalyango worked his way to full professorship in record time, and was offered tenure, with the implied promise that his position as the University was secure and that despite his protected status, he would be accorded fair treatment and good faith in all his encounters with the University. In exchange for this reliance, Dr. Kalyango worked tirelessly, authoring books and authoritative articles, while traveling the world as an ambassador for Ohio University, establishing good will and obtaining grants for the University in millions of dollars. Ohio University was the direct beneficiary of these efforts.

40

139.     Once the false allegations were presented against Dr. Kalyango, Ohio University engaged in a series of contract breaches, including the complete and utter failure to follow the same policies and procedures imposed upon Dr. Kalyango, while Dr. Kalyango, relying upon the misrepresentations of the University, continued to cooperate in the flawed investigation, and process, following all of the procedure and policy without fail, only to have the University breach the policy repeatedly in order to terminate him without cause. The misrepresentations of the University as set forth in the Faculty Handbook were reasonably relied upon by Dr. Kalyango, all to his detriment.

140.     The University created a policy where the last stage of the process of termination was the only chance for due process, which included an evidentiary hearing so that for the first time, real evidence could be presented and challenged. Dr. Kalyango followed the process, participated in the hearing, presented witnesses from all over the world to speak the truth about his history and demonstrated the baseless nature of the complaints against him. Dr. Kalyango overwhelmingly prevailed in that process, as the Senate Committee overwhelmingly found there was inadequate evidence to support the claims, and Dr. Kalyango was damaged and harmed by the flawed process, including a protracted investigation spanning more than two years, and the University's misrepresentation about the fairness of the process Dr. Kalyango was forced to follow.

141.     As a direct and proximate result of Ohio University's breach of contract, upon which Dr. Kalyango detrimentally relied, he has been terminated, losing his vocation, reputation and all of his scholarship devoted to Ohio University.

142.     As a direct and proximate result of Ohio University's breach of contract and misrepresentation, Dr. Kalyango has suffered monetary damages including economic loss, loss of tenured employment remuneration, emotional damages and permanent damage to his reputation.

<u>**Count Seven**</u>
**(Breach of Contract/ Good Faith and Fair Dealing)**

143.     Dr. Kalyango incorporates herein as if fully rewritten paragraphs 1-142.

144.     Every contractual agreement has an implied duty of good faith and fair dealing.

145.     The contractual agreement between Dr. Kalyango and Ohio University had the duty of good faith and fair dealing. This implied agreement was breached by Ohio University in countless ways, including but not limited to:

a. Refusing to conduct a prompt investigation

b. Refusing to retain or assign a trained university-experienced investigator

c. Refusing to protect confidentiality

d. Failing to follow the procedures mandated by its Faculty Handbook all to the detriment of Dr. Kalyango

e. Allowing Professor Sweeney to become involved in the investigation and prosecution of Dr. Kalyango

f.  Allowing Director Stewart to change procedure to ensure the college would present a recommendation of detenuring to the Provost

g. Ignoring Dr. Kalyango's requests for diversity in all review committees

h.  Prematurely placing Dr. Kalyango on administrative leave after he continued to teach for more than a year after the false complaint was made

i. Allowing the investigator to reopen a closed investigation after the investigator was named a defendant in a lawsuit

j. Board of Trustees refusing and overruling the conclusion that the investigation and underlying claims were unsubstantiated; and reversing the decision of the Senate Hearing Committee after this Committee properly and lawfully concluded Dr. Kalyango should be vindicated and reinstated to his teaching duties.

k. Board of Trustees conspiring to harm Dr. Kalyango under the guise of prohibiting discrimination.

146.     As a direct and proximate result of Ohio University's breach of good faith and fair dealing Dr. Kalyango has suffered monetary damages including economic loss, emotional damages loss of tenured employment remuneration, and permanent damage to his reputation.

**Count Eight**
**(Breach of Contract and Policy/Conspiracy**

147.     Plaintiff Kalyango incorporates herein as if fully rewritten Paragraphs 1 through 146.

148.     At all times, defendant Ohio University insisted that plaintiff Kalyango follow all the policies and procedures regulating the investigation and the potential loss of tenure process.

149.     At all times material, plaintiff Kalyango followed those requirements, including meeting all deadlines and timelines while Ohio University regularly and routinely failed to follow its own policies and procedures.

150.     After it was discovered that school director Robert Stewart breached the school and college policy with respect to investigating and obtaining votes from a Promotion & Tenure Committee from professors within the school regarding the loss of tenure issue, Ohio University took no action. The University ratified the unlawful conduct, which even the Dean of the college admitted in the Senate Hearing Committee to be improper. Director Stewart chose only those professors he believed would support his position which was prejudicial to plaintiff Kalyango.

43

151.    In those individually scheduled secretive meetings, only six professors indicated a vote for loss of tenure to Director Stewart, but nonetheless, he accepted that recommendation in clear violation of policy. Ohio University relied on this false premise and took no action to remedy the breach, which ultimately resulted in Dr. Kalyango's termination even though the only group to provide him due process– the Senate Hearing Committee found the claims were unsubstantiated.

152.    The University also knew that at least one professor, Professor Sweeney, was conspiring to harm Dr. Kalyango by threatening and retaliating against other professors who did not support the suggestion that plaintiff Kalyango should lose his tenure at the University.

153.    Professor Sweeney asserted pressure on other professors to undermine and harm plaintiff Kalyango throughout the process and throughout the investigation process, and further conspired with the involved alleged complaining witnesses to encourage them to falsify and create improper information, all which was utilized against plaintiff Kalyango.

154.    These facts and many others as alleged herein were known to Ohio University, and no action was taken. These undisputed facts were proven at the Senate Committee hearing, and in part relied upon by the Senate Hearing Committee to prove the unfairness of the process leveled against Dr. Kalynago. These same undisputed facts were captured within a transcript allegedly reviewed by the Board of Trustees, who then ratified the improper and contractually prohibited conduct, all in an effort to harm Dr. Kalyango. The only explanation for the conduct of the Board of Trustees in ignoring violation after violation of policy by the University is an underlying conspiracy to make an example of Dr. Kalyango based on motives the Board of Trustees are unwilling to publicly acknowledge.

155. Ohio University's decision to take no action knowing that a conspiracy existed and that professors were engaging in a breach of policy and unlawful conduct is a tacit admission that the process was flawed because no action was taken.

156. The Board of Trustees improperly conspired individually and collectively to condone and ratify the University's utter failure to follow its own policy in order to make an example of Dr. Kalyango and end his career to serve University political ends.

157. Dr. Kalyango asserts that the Board of Trustees conspired to overturn the decision of the Senate Hearing Committee because the Board wanted to make a public statement against sexual harassment, knowing the University had tolerated and condoned far worse conduct by other professors.

158. As a direct and proximate result of Ohio University's failure to follow its own policies, including the Board of Trustees, and ratifying the conduct of its professors to engage in unlawful and discriminatory conduct, as well as the ongoing conspiracy by the Board of Trustees and others at the University, Dr. Kalyango has sustained damages including loss of income, loss of reputation, emotional injury, loss of tenured employment remuneration, and loss of his business profession.

<u>**Count Nine**</u>
<u>**Breach of Administrative Policies**</u>

159. Plaintiff Kalyango incorporates herein as if fully rewritten Paragraphs 1 through 158.

160. Pursuant to the Ohio University Faculty Handbook regarding tenure and loss of tenure, plaintiff Kalyango was entitled to a hearing before a Faculty Senate Hearing Committee which consisted of third-term Senators who are university professors, and who were selected by the Faculty Senate.

161.    These professors had no affiliation in the investigation and had no direct contact with Dr. Kalyango throughout the protracted investigation.

162.    Based upon the policy and procedure, a hearing was conducted on December 10th and December 11th, 2020 in which the Senate Hearing Committee functioned in the capacity of a jury to listen to evidence presented by both Ohio University in prosecuting Dr. Kalyango seeking de-tenuring, and the defense offered by Dr. Kalyango.

163.    Before the hearing - which was the first time Dr. Kalyango had been provided due process which he had been requesting since 2017 – Dr. Kalyango asked for an extended hearing given the number of witnesses that he felt were necessary to provide a defense.  This request was rejected.

164.    Ohio University designated all aspects of the hearing including the time allotted for the defense, the manner and time limitations for both the direct examination and cross-examination of witnesses, and the specific burden of proof.  All these policies and procedures were based upon directives mandated by Ohio University, and all these policies and procedures were accepted by Ohio University's counsel, and all Ohio University representatives, without objection.

165.    Following the two-day hearing, the Senate Hearing Committee ruled overwhelmingly that Ohio University failed to meet its burden of proof, that the allegations against Dr. Kalyango were unsubstantiated, and that there was systemic racism within the University, both historically and with respect to Dr. Kalyango.

166.    The Senate Hearing Committee, which provided due process to plaintiff Kalyango for the first time, ruled that the de-tenuring process should end and that plaintiff Kalyango should be reinstated to his position as a full tenured professor.

167.    The decision by the Senate Hearing Committee was then reviewed by the Board of Trustees who allegedly were interested in an objective analysis of the hard work and effort put forth by the Faculty Senate.

168.    Instead of accepting the decision by the fact finders, the Board of Trustees issued objections, but the objections mainly challenged the same  procedure and policy dictated by Ohio University.

169.    In other words, the Board of Trustees objected to the burden of proof, and other issues regarding the presentation of evidence, all of which were mandated by Ohio University and accepted by Ohio University's counsel throughout the entire proceeding.

170.    It is particularly insidious that the Board of Trustees objected to policy and procedure that Ohio University authorized only because the outcome was inconsistent with the preset conspiratorial  determination to make an example of Dr. Kalyango and terminate him regardless of the evidence.  This is particularly problematic because throughout the entire investigation process which lasted more than two years, Dr. Kalyango continually complained about Ohio University's failure to follow its own policies.

171.    In addition, the Board of Trustees did not want to adopt the permanent findings of the Senate Hearing Committee which noted in its response to the Board's demand for specific fact finding that there was evidence of systemic racism and professors of color were treated differently. To be sure, if the Board of Trustees would have done their proper duty and not conspired to protect the reputation of the University, the Board would have conceded that there were significant problems at the University with racism and other professors and employees in protected status; the best way to avoid those truthful issues was to sacrifice Dr. Kalyango and claim the Senate Hearing Committee's conclusions were simply wrong.

172.     Such conduct by the Board of Trustees violates every premise of employment law, and clearly establishes that Dr. Kalyango's termination was without cause and in breach of the tenure agreement and contract.

173.     As a direct and proximate result of the decisions made by the Board of Trustees, Dr. Kalyango  has sustained damages including loss of income, loss of reputation, loss of tenured employment remuneration, emotional injury, and loss of his business profession.

<b>Count Ten</b><br><b>Retaliation</b>

174.     Plaintiff Kalyango incorporates herein as if fully rewritten paragraphs 1-173.

175.     As mentioned previously in this Complaint, Dr. Kalyango was subjected to retaliation by Dr. Sweeney, Director Stewart, and Dean Titsworth, along with the Board of Trustees for the mere act of defending his rights and demanding that the University follow its own policies and procedures as set forth in the Faculty Handbook.

176.     The Faculty Handbook prohibits retaliation in any form, and even though Dr. Kalyango has made parallel allegations before administrative agencies, including the Ohio Civil Rights Commission, with respect to retaliation based upon his protected status, the retaliation as set forth herein was much more pervasive and that whenever Dr. Kalyango would complain about any aspect of the process or procedure, the intensity and conduct of the University increased to harm him.

177.     The retaliatory aspect of the University's conduct, along with its employees and agents, including the Board of Trustees, is particularly frustrating because again, there are specific policies the University is required to enforce with respect to retaliation and yet the University has tolerated this action in an effort to accomplish its preset goal which is to destroy Dr. Kalyango and his career.

178. As a direct and proximate result of the retaliatory actions of the University, including the Board of Trustees, Professor Sweeney, Director Stewart, and Dean Titsworth, Dr. Kalyango has suffered severe damages, economic loss and damage to his reputation as aforesaid.

**Count Eleven**
**Public Policy Violation**

179. Plaintiff Kalyango incorporates herein as if fully rewritten paragraphs 1 through 178.

180. Ohio public policy dictates that public agencies, such as Ohio University, must follow the highest standards with respect to their own policies and procedures. A violation of the policies and procedures to the detriment of an employee or any member of the public, is a violation of Ohio public policy which mandates that public universities set the standard of fairness and fair dealing.

181. As set forth herein, Ohio University in all situations involving Dr. Kalyango intentionally, wantonly and recklessly violated its policies and procedures all for a preset outcome of de-tenuring Dr. Kalyango, to make an example of Dr. Kalyango, and to prohibit the public from knowing the truth about the activities that were ongoing at the University.

182. Such conduct, in an effort to protect the University's image and reputation, at the expense of Dr. Kalyango, one of its most highly decorated and erudite professors is a violation of public policy, and contrary to law.

183. As a direct and proximate result of Ohio University's violation of public policy, Dr. Kalyango has been terminated, without cause, and inconsistent with the fact finding body created by the University to determine whether or not the charges against him were substantiated. The Board of Trustees' decision to overturn the decision of the Senate Hearing Committee is an

example of a violation of public policy, and is not in the best interests of the public and the policies of Ohio.

184.    As a direct and proximate result of the conduct of Ohio University, Dr. Kalyango has suffered economic loss, damage to his reputation, loss of tenured employment remuneration, and a loss of his vocation.

**Count Twelve**
**(Breach of Employment Contract/Detrimental Reliance)**

185.    Dr. Kalyango incorporates herein as if fully rewritten paragraphs 1-185.

186.    As a tenured professor Dr. Kalyango had contractual protections established by the Faculty Handbook and the implied protections followed by Ohio University historically and for other professors, especially those professors who were not employees of color.

187.    Pursuant to these contractual protections, Dr. Kalyango was entitled to rely upon Ohio University policy and procedures set forth in the Faculty Handbook as well as Ohio University's obligation of good faith and fair dealing regarding his employment.

188.    In reliance on these clear responsibilities, Dr. Kalyango worked his way to full professorship in record time, and was offered tenure, with the implied promise that his position as the university was secure and that despite his protected status, he would be accorded fair treatment and good faith in all his encounters with the University. In exchange for this reliance, Dr. Kalyango worked tirelessly, authoring books and authoritative articles, while traveling the world as an ambassador for Ohio University, establishing good will and obtaining grants for the University in millions of dollars. Ohio University was the direct beneficiary of these efforts.

189.    Once the false allegations were presented against Dr. Kalyango, Ohio University engaged in a series of contract breaches, including the complete and utter failure to follow the same policies and procedures imposed upon Dr. Kalyango, while Dr. Kalyango, relying upon the

misrepresentations of the University, continued to cooperate in the flawed investigation, and process, following all of the procedure and policy without fail, only to have the University breach the policy repeatedly in order to terminate him without cause.

190.    The University created a policy where the last stage of the process of termination was the only chance for due process, which included an evidentiary hearing so that for the first time, real evidence could be presented and challenged. Dr. Kalyango followed the process, participated in the hearing, presented witnesses from all over the world to speak the truth about his history and demonstrated the baseless nature of the complaints against him. Dr. Kalyango overwhelmingly prevailed in that process, as the Senate Committee overwhelmingly found there was inadequate evidence to support the claims, and Dr. Kalyango was damaged and harmed by the flawed process, including a protected investigation spanning more than two years.

191.    As a direct and proximate result of Ohio University's breach of contract, upon which Dr. Kalyango detrimentally relied, he has been terminated, losing his vocation, reputation and all of his scholarship devoted to Ohio University.

192.    As a direct and proximate result of Ohio University's breach of contract, Dr. Kalyango has suffered monetary damages including economic loss, loss of tenured employment remuneration, emotional damages and permanent damage to his reputation.

### Count Thirteen
### (Breach of Contract/ Good Faith and Fair Dealing)

193.    Dr. Kalyango incorporates herein as if fully rewritten paragraphs 1-192.

194.    Every contractual agreement has an implied duty of good faith and fair dealing.

195.    The contractual agreement between Dr. Kalyango and Ohio University had the duty of good faith and fair dealing. This implied agreement was breached by Ohio University in countless ways, including but not limited to:

a. Refusing to conduct a prompt investigation

b. Refusing to retain or assign a trained university-experienced investigator

c. Refusing to protect confidentiality

d. Failing to follow the procedures mandated by its Faculty Handbook all to the detriment of Dr. Kalyango

e. Allowing Professor Sweeney to become involved in the investigation and prosecution of Dr. Kalyango

f. Allowing Director Stewart to change procedure to ensure the college would present a recommendation of detenuring to the Provost

g. Ignoring Dr. Kalyango's requests for diversity in all review committees

h. Prematurely placing Dr. Kalyango on administrative leave after he continued to teach for more than a year after the false complaint was made

i. Allowing the investigator to reopen a closed investigation after the investigator was named a defendant in a lawsuit

j. Board of Trustees refusing and overruling the conclusion that the investigation and underlying claims were unsubstantiated; and reversing the decision of the Senate Hearing Committee after this Committee properly and lawfully concluded Dr. Kalyango should be vindicated and reinstated to his teaching duties.

k. Board of Trustees conspiring to harm Dr. Kalyango under the guise of prohibiting discrimination.

196.    As a direct and proximate result of Ohio University's breach of good faith and fair dealing   Dr. Kalyango has suffered monetary damages including economic loss, emotional damages loss of tenured employment remuneration, and permanent damage to his reputation.

**Count Fourteen**
**(Breach of Contract and Policy**

197.     Plaintiff Kalyango incorporates herein as if fully rewritten Paragraphs 1 through 196.

198.     At all times, defendant Ohio University insisted that plaintiff Kalyango follow all the policies and procedures regulating the investigation and the potential loss of tenure process.

199.     At all times material, plaintiff Kalyango followed those requirements, including meeting all deadlines and timelines while Ohio University regularly and routinely failed to follow its own policies and procedures.

200.     After it was discovered that school director Robert Stewart breached the school and college policy with respect to investigating and obtaining votes from a Promotion & Tenure Committee from professors within the school regarding the loss of tenure issue, Ohio University took no action. The University ratified the unlawful conduct, which even the Dean of the college admitted in the Senate Hearing Committee to be improper. Director Stewart chose only those professors he believed would support his position which was prejudicial to plaintiff Kalyango.

201.     In those individually scheduled secretive meetings, only six professors indicated a vote for loss of tenure to Director Stewart, but nonetheless, he accepted that recommendation in clear violation of policy. Ohio University relied on this false premise and took no action to remedy the breach, which ultimately resulted in Dr. Kalyango's termination even though the only group to provide him due process– the Senate Hearing Committee found the claims were unsubstantiated.

202.     The University also knew that at least one professor, Professor Sweeney, was conspiring to harm Dr. Kalyango by threatening and retaliating against other professors who did not support the suggestion that plaintiff Kalyango should lose his tenure at the University.

203.     Professor Sweeney asserted pressure on other professors to undermine and harm plaintiff Kalyango throughout the process and throughout the investigation process, and further conspired with the involved alleged complaining witnesses to encourage them to falsify and create improper information, all which was utilized against plaintiff Kalyango.

204.     These facts and many others as alleged herein were known to Ohio University, and no action was taken. These undisputed facts were proven at the Senate Committee hearing, and in part relied upon by the Senate Hearing Committee to prove the unfairness of the process leveled against Dr. Kalynago. These same undisputed facts were captured within a transcript allegedly reviewed by the Board of Trustees, who then ratified the improper and contractually prohibited conduct, all in an effort to harm Dr. Kalyango. The only explanation for the conduct of the Board of Trustees in ignoring violation after violation of policy by the University is an underlying conspiracy to make an example of Dr. Kalyango based on motives the Board of Trustees are unwilling to publicly acknowledge.

205.     Ohio University's decision to take no action knowing that a conspiracy existed and that professors were engaging in a breach of policy and unlawful conduct is a tacit admission that the process was flawed because no action was taken.

206.     As a direct and proximate result of Ohio University's failure to follow its own policies, and ratifying the conduct of its professors to engage in unlawful and discriminatory conduct, plaintiff Kalyango has sustained damages including loss of income, loss of reputation, emotional injury, loss of tenured employment remuneration, and loss of his business profession.

**Count Fifteen**
**Breach of Administrative Policies**

207.    Plaintiff Kalyango incorporates herein as if fully rewritten Paragraphs 1 through 206.

208.    Pursuant to the Ohio University Faculty Handbook regarding tenure and loss of tenure, plaintiff Kalyango was entitled to a hearing before a Faculty Senate Hearing Committee which consisted of third-term Senators who are university professors, and  who were selected by the Faculty Senate.

209.    These professors had no affiliation in the investigation and had no direct contact with Dr. Kalyango throughout the protracted investigation.

210.    Based upon the policy and procedure, a hearing was conducted on December 10th and December 11th, 2020 in which the Senate Hearing Committee functioned in the capacity of a jury to listen to evidence presented by both Ohio University in prosecuting Dr. Kalyango seeking de-tenuring, and the defense offered by Dr. Kalyango.

211.    Before the hearing - which was the first time Dr. Kalyango had been provided due process which he had been requesting since 2017 – Dr. Kalyango asked for an extended hearing given the number of witnesses that he felt were necessary to provide a defense.  This request was rejected.

212.    Ohio University designated all aspects of the hearing including the time allotted for the defense, the manner and time limitations for both the direct examination and cross-examination of witnesses, and the specific burden of proof.  All these policies and procedures were based upon directives mandated by Ohio University, and all these policies and procedures were accepted by Ohio University's counsel, and all Ohio University representatives, without objection.

213.    Following the two-day hearing, the Senate Hearing Committee ruled overwhelmingly that Ohio University failed to meet its burden of proof, that the allegations against Dr. Kalyango were unsubstantiated, and that there was systemic racism within the University, both historically and with respect to Dr. Kalyango.

214.    The Senate Hearing Committee, which provided due process to plaintiff Kalyango for the first time, ruled that the de-tenuring process should end and that plaintiff Kalyango should be reinstated to his position as a full tenured professor.

215.    The decision by the Senate Hearing Committee was then reviewed by the Board of Trustees who allegedly were interested in an objective analysis of the hard work and effort put forth by the Faculty Senate.

216.    Instead of accepting the decision by the fact finders, the Board of Trustees issued objections, but the objections mainly challenged the same procedure and policy dictated by Ohio University.

217.    In other words, the Board of Trustees objected to the burden of proof, and other issues regarding the presentation of evidence, all of which were mandated by Ohio University and accepted by Ohio University's counsel throughout the entire proceeding.

218.    It is particularly insidious that the Board of Trustees objected to policy and procedure that Ohio University authorized only because the outcome was inconsistent with the preset determination to make an example of Dr. Kalyango and terminate him regardless of the evidence.  This is particularly problematic because throughout the entire investigation process which lasted more than two years, plaintiff Kalyango continually complained about Ohio University's failure to follow its own policies.

219.    Dr. Kalyango asserts that the Board of Trustees conspired to overturn the decision of the Senate Hearing Committee because the Board wanted to make a public statement against

sexual harassment, knowing the University had tolerated and condoned far worse conduct by other professors.

220.    In addition, the Board of Trustees did not want to adopt the permanent findings of the Senate Hearing Committee which noted in its response to the Board's demand for specific fact finding that there was evidence of systemic racism and professors of color were treated differently. To be sure, if the Board of Trustees would have done their proper duty and not conspired to protect the reputation of the University, the Board would have conceded that there were significant problems at the University with racism and other professors and employees in protected status; the best way to avoid those truthful issues was to sacrifice Dr. Kalyango and claim the Senate Hearing Committee's conclusions were simply wrong.

221.    Such conduct by the Board of Trustees violates every premise of employment law, and clearly establishes that Dr. Kalyango's termination was without cause and in breach of the tenure agreement and contract.

222.    As a direct and proximate result of the decisions made by the Board of Trustees, Dr. Kalyango has sustained damages including loss of income, loss of reputation, loss of tenured employment remuneration, emotional injury, and loss of his business profession.

## Count Sixteen
## Public Policy Violation

223.    Plaintiff Kalyango incorporates herein as if fully rewritten paragraphs 1 through 222.

224.    Ohio public policy dictates that public agencies, such as Ohio University, must follow the highest standards with respect to their own policies and procedures.  A violation of the policies and procedures to the detriment of an employee or any member of the public, is a violation

of Ohio public policy which mandates that public universities set the standard of fairness and fair dealing.

225.     As set forth herein, Ohio University in all situations involving Dr. Kalyango intentionally and wantonly and recklessly violated its policies and procedures all for a preset outcome de-tenuring Dr. Kalyango, to make an example of Dr. Kalyango, and to prohibit the public from knowing the truth about the activities that were ongoing at the University.

226.     Such conduct, in an effort to protect the University's image and reputation, at the expense of Dr. Kalyango, one of its most highly decorated and erudite professors is a violation of public policy, and contrary to law.

227.     As a direct and proximate result of Ohio University's violation of public policy, Dr. Kalyango has been terminated, without cause, and inconsistent with the fact-finding body created by the University to determine whether or not the charges against him were substantiated.  The Board of Trustees' decision to overturn the decision of the Senate Hearing Committee is an example of a violation of public policy, and not in the best interests of the public and the policies of Ohio.

228.     As a direct and proximate result of the conduct of Ohio University, Dr. Kalyango has suffered economic loss, damage to his reputation, loss of tenured employment remuneration, and a loss of his vocation.

**Wherefore**, Plaintiff, Dr. Yusuf Kalyango, requests the Court grant the following relief:

A:      Declare that the acts and conduct of Ohio University constitute violations of Title VII, 42 USC 200e, the Civil Rights Act of 1991, 42 USC 1981a, the Ohio Civil Rights Act, ORC 4112.01 *et.seq.,* and 42 USC 1981, ORC 4112.02 et. seq and the common law of Ohio.

B.     Grant a permanent injunction enjoining Ohio University and its officers, agents, employees, and all persons in active participation from engaging in any employment practices which discriminate in any way, including discrimination on the basis of gender, race, national origin and retaliation.

C.     Order Ohio University to institute and otherwise carry out policies, practices, and programs that provide equal opportunities for all employees, and which eradicates the effects of past and present unlawful employment practices.

D.     Order Ohio University to reinstate Dr. Kalyango to his full professor tenured status and to make him whole by providing appropriate back pay with prejudgment interest and for other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

E.     Grant to Dr. Kalyango against Ohio University appropriate compensatory and exemplary damages, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), along with the costs of this action including statutory reasonable attorney fees as provided by statute.

F.     Such other relief as the Court deems just, appropriate and proper in the public interest.

Respectfully submitted,


**s/Gregory A. Beck**
Gregory A. Beck (0018260)
Mel L. Lute, Jr. (0046752)
Andrea K. Ziarko (0073755)
BAKER | DUBLIKAR
400 S. Main Street
North Canton, Ohio 44720
e-mail: beck@bakerfirm.com
lute@bakerfirm.com
andreaz@bakerfirm.com
Telephone:     (330) 499-6000
Telecopier:     (330) 499-6423
Counsel for Plaintiff, Yusuf Kalyango


## **JURY DEMAND**

A trial by jury is demanded herein on all issues presented to the Court.


**s/Gregory A. Beck**
Gregory A. Beck (0018260)
Mel L. Lute, Jr. (0046752)
Andrea K. Ziarko (0073755)
BAKER | DUBLIKAR, BECK